T.C. Memo. 1997-282


UNITED STATES TAX COURT


JAMES E. AND CHUNG H. PEACOCK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14094-94.                    Filed June 23, 1997.


<u>Robert J. Chicoine</u> and <u>Larry N. Johnson</u>, for petitioners.

<u>Robert S. Scarbrough</u>, <u>Gregory M. Hahn</u>, and <u>Roy Wulf</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows:

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)(1)[1] | Sec. 6653(b)(1)(B) | Sec. 6653(b)(2) | Sec. 6661 |
| 1983 | $101,744 | $50,872 | | [2] | $25,436 |
| 1984 | 21,946 | 10,973 | | [2] | 5,487 |
| 1985 | 7,233 | 3,617 | | [2] | 1,808 |
| 1986 | 34,075 | 25,556 | [2] | | 8,519 |
| 1987 | 7,387 | 5,540 | [2] | | 1,847 |

[1] Sec. 6653(b)(1)(A) for 1986 and 1987.

[2] Fifty percent of the interest due on the underpayment due to fraud.

After concessions,[1] the issues for decision are:

1.  Relating to respondent's use of the net worth method:

a.  Whether respondent's determination was arbitrary. We hold that it was not.

b.  Whether respondent adequately investigated leads relating to petitioners' cash hoard.  We hold that respondent did.

2.  Relating to petitioners' cash on hand on December 31, 1982, 1983, 1984, 1985, 1986, and 1987:

a.  Whether petitioners had $140,000 in cash on December 31, 1982, as respondent contends; more than $660,000, as petitioners contend; or some other amount.  We find that petitioners had $279,000 in cash on December 31, 1982.

---

[1] Respondent concedes that for 1983 to 1987, petitioners may deduct additional depreciation of $3,631, $9,255, $11,902, $11,736, and $11,736, respectively, on their property at 3600 Glenstone Avenue, Springfield, Missouri.  Respondent also concedes that petitioners had a $896 capital gain in 1986. Respondent concedes that $9,000 that respondent had determined was taxable in 1986, is not taxable.  Respondent concedes that in respondent's calculation of their unreported income, petitioners' 1987 personal expenses are overstated by $50.

b.  Whether, as petitioners contend, $90,000 was stolen from them in January 1985.  We hold that it was not.

c.  Whether respondent overstated petitioners' 1985 personal expenses by $25,060.  We hold that respondent did not.

d.  Whether petitioners had $40,000 in cash on hand on December 31, 1983, 1984, 1985, 1986, and 1987, as respondent contends; about $385,000, $340,000, $250,000, $182,500, $123,000, as petitioners contend; or some other amount.  We hold that they had $40,000 in cash on hand on December 31, 1983, 1984, 1985, 1986, and 1987.

3.  Whether petitioners had unreported income of $221,961 in 1983, $45,598 in 1984, $8,608 in 1985, $69,788 in 1986, and $29,872 in 1987, as respondent contends; zero for 1983 to 1987, as petitioners contend; or some other amount.  We hold that petitioners had unreported income of $82,961 in 1983, $45,598 in 1984, $8,608 in 1985, $60,788 in 1986, and $29,822 in 1987.

4.  Whether petitioners are liable for additions to tax for fraud under section 6653(b) for tax years 1983 to 1987.  We hold that they are.

5.  Whether the statute of limitations bars assessment of tax for the years in issue.  We hold that it does not.

6.  Whether petitioners are liable for additions to tax for substantial understatement of tax under section 6661.  We hold that they are for the years they substantially underpaid tax.

7. Whether petitioners are liable for self-employment tax under section 1401 for the years in issue. We hold that they are.

Section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioners

Petitioners lived in Tacoma, Washington, when they filed the petition in this case. Petitioners are married and filed joint Federal income tax returns for each of the years in issue.

James E. Peacock (petitioner-husband) served in the U.S. Army for a total of 20 years over a 26-year period. He had tours of duty in Korea, Germany, and Vietnam. His duties included managing clubs for enlisted personnel, noncommissioned officers, and officers. Petitioner-husband retired from the Army in 1976.

Petitioner-husband met Chung H. (Judy) Peacock (petitioner-wife) in 1958 while serving a tour of duty in Korea. Petitioners were married in Korea in 1961. Petitioner-wife immigrated to the United States in 1963.

B.   Petitioners' Family

   1.   Petitioner-Husband's Parents

Wilma MacFarland and Tobey Peacock were petitioner-husband's parents.  They were divorced before June 1957.  In June 1957, Wilma MacFarland married Winston MacFarland (MacFarland).  Wilma and MacFarland were divorced in 1973.  Wilma MacFarland died in 1979.

Wilma MacFarland lived in a mobile home.  When she and MacFarland were divorced in 1973, she had almost no assets.  MacFarland was required by court order to make support payments to her of $150 a month.  Wilma MacFarland reported no wage or self-employment income on her tax returns for tax years 1968 to 1979.  She reported less than $28,500 as wages or self-employment income during her life and never more than $3,600 in any one year.

MacFarland had almost no assets when he and Wilma MacFarland were divorced in 1973.  After 1973, MacFarland never earned more than $11,439 a year.  After 1978, he reported no wage or self-employment income on his income tax returns.  From 1980 until the mid-1980's, MacFarland worked as an apartment manager for petitioner-husband in exchange for free rent.  MacFarland used his income from social security to pay his expenses.  He was careful not to spend more than the amount of his Social Security checks.  Petitioner-husband sometimes gave MacFarland small amounts of money.  In the mid-1980's, MacFarland moved into a

two-bedroom cement house that he built. The house was unfinished and had very little furniture. In 1985, MacFarland deeded the house to a friend, Kathleen Griffin (Griffin), but he lived in the house until just before he died in February 1989. After he died, Griffin sold the house for $14,000.

Tobey Peacock married Donna Peacock in 1960. Tobey Peacock died in 1973. Tobey Peacock owned a 40-acre dairy farm, drove a dairy truck, and raised and bred animals. Tobey Peacock lived frugally. Tobey Peacock reported less than $3,000 as wages or self-employment income during his life, and never more than $1,200 in any one year. Tobey Peacock disapproved of petitioners' lifestyle.

### 2. Petitioner-Wife's Mother

Il Nam Lee was petitioner-wife's mother. Il Nam Lee died in 1982. Chang Un MacFarland is Il Nam Lee's sister. Chang Un MacFarland married MacFarland, petitioner-husband's stepfather.

Ki Chong Kim is Chang Un MacFarland's son. In 1983, Chang Un MacFarland and Ki Chong Kim came to the United States for a short time, and then returned to Korea.

### 3. Petitioner-Wife's Brothers and Sisters

Kil Lee, Song Lee, and James Suil Peacock, Jr. (Suil Peacock) are petitioner-wife's brothers. Kyu Lee is Song Lee's son. Okhee Cho and K.C. Urbon are petitioner-wife's sisters.

Petitioners told U.S. immigration officials that Suil Peacock and K.C. Urbon were their adopted children so Suil

Peacock and K.C. Urbon could immigrate to the United States. However, at that time, petitioners had not adopted Suil Peacock or K.C. Urbon.

Kil Lee and Kiye Oglesby have lived together for many years, but are not married. Kyu Im Koon is petitioner-wife's niece. She is married to Michael Koon.

C.  Petitioners' Businesses

1.  Background

Petitioners owned a massage parlor known as "Flamingo" in Spanaway, Washington, from 1972 to 1976.

Petitioners owned and operated massage parlors known as "Tokyo Sauna" during the years in issue. They opened a Tokyo Sauna in Joplin, Missouri, in 1975, a second Tokyo Sauna in Springfield, Missouri, in 1977, and a third Tokyo Sauna in Billings, Montana, in 1984. They closed the Tokyo Sauna in Joplin late in 1986. At least one of the Tokyo Saunas had a sign with petitioners' home phone number stating that if a customer were dissatisfied he should call petitioner-wife.

2.  Operation of the Tokyo Saunas

The masseuses who worked at each of petitioners' Tokyo Saunas were female Korean immigrants. They engaged in illegal prostitution with their customers. Petitioners told the masseuses how to operate the business and provide services to customers. Petitioners regularly telephoned each Tokyo Sauna.

At each Tokyo Sauna, one of the masseuses was the manager. The manager was responsible for ensuring that petitioners got their share of each masseuse's receipts. The manager was not paid extra for her managerial work.

Petitioner-wife instructed each masseuse to record the time she spent with each customer and the price of the service on a daily sheet under the masseuse's name or initial. Petitioner-wife instructed the masseuses to divide the total amount of money they collected from customers by two, because one-half of the receipts belonged to petitioners. If a masseuse was very busy, one of the other masseuses wrote some of the information on the daily sheet for her. At the end of the day, the daily sheet was wrapped around the day's receipts and put in the safe. The Tokyo Saunas were primarily cash businesses.

Petitioner-husband visited each Tokyo Sauna about once a month, except when he was in jail in 1987. Petitioner-wife often went to the saunas with him. Petitioner-husband collected the daily sheets and petitioners' share of the money during his visits. While petitioner-husband was in jail in 1987, K.C. Urbon or Kil Lee went to the saunas to collect the money and records for him and gave them to petitioner-wife.

3. Masseuses

Myong Cha Jackson was a masseuse at the Joplin Tokyo Sauna for 1 year starting in 1983 and at the Springfield Tokyo Sauna

for 2 years thereafter. She made about $35,000 a year working for petitioners.

Young Ju Lee (Young Ju Burnett) worked as a masseuse at the Springfield Tokyo Sauna intermittently from 1978 or 1979 through 1983. She made about $4,000 a month working for petitioners. She is Kiye Oglesby's sister.

4. Record Keeping

Petitioner-husband brought the daily sheets to Tacoma and gave them to Kil Lee. Kil Lee reviewed them to see how many masseuses were working, how much money each masseuse earned, and the number of customers each masseuse had. Kil Lee stored the daily sheets in a file cabinet. In 1986, petitioner-wife told Kil Lee to burn the daily sheets he was storing. Thereafter, Kil Lee or petitioner-husband burned the daily sheets after reviewing them.

Rheda Amoroso (Amoroso) worked for Kootz Accounting as a bookkeeper during the years in issue. She prepared monthly statements, profit and loss statements, and tax returns for petitioners.

Petitioners prepared weekly receipt reports for each sauna and sent them to Amoroso. Petitioners did not send the daily sheets to Amoroso. Amoroso used the weekly receipt reports to compute the Tokyo Saunas' annual revenue and to prepare petitioners' tax returns. She did not know that the masseuses

kept half of the gross receipts or that petitioners did not report all of their gross receipts to her.

Petitioner-husband signed, and directed each masseuse to sign, papers showing that masseuses were paid about $200 a week. Petitioner-husband told the masseuses to give those payroll papers to Amoroso. Petitioners issued Forms W-2 showing that each masseuse earned substantially less than petitioners knew they earned. Petitioners withheld a fixed amount of taxes from the masseuses regardless of the amount they earned.

D.   The Daily Sheets Kil Lee Gave to Respondent

In November 1987, Kil Lee found four sets of daily sheets that he had not burned and gave them to respondent. Those daily sheets show the following:

| Tokyo Sauna | Dates | Number of days | Number of masseuses | Gross receipts |
|---|---|---|---|---|
| Joplin | 10/29/83– 12/2/83 | 35 | 5 | $42,696 |
| Springfield | 10/29/83– 12/2/83 | 35 | 5 | 39,030 |
| Billings | 3/28/87– 4/24/87 | 28 | 3 | 25,700 |
| Springfield | 3/28/87– 4/24/87 | 28 | 5 | 50,306 |

E.   Petitioners' Net Worth

1.   Overview

Petitioners concede that respondent computed their net worth correctly except for the amount of their cash on hand on December 31, 1982, 1983, 1984, 1985, 1986, and 1987.

Respondent did not include petitioners' personal living expenses in the net worth calculation on which the notice of deficiency was based. During the years in issue, petitioners gave gifts and support to Suil Peacock and his family, had a live-in maid, took trips to Florida, and gambled. Respondent did not include those expenses in the net worth calculation.

In the net worth calculation, respondent took into account the fact that $4,000 was stolen from petitioners in 1983. Petitioners did not deduct a theft loss on their 1983 tax return.

2. Petitioners' Pre-1983 Use of Banks and Other Financial History

Petitioners borrowed $28,000 in 1977 and $13,630 in 1978 from the North Pacific Bank in Tacoma, Washington. Petitioners submitted a statement of joint financial condition with their 1978 loan application. After adjustment to show actual cost and accumulated depreciation and to correct for minor errors, it states that petitioners had a net worth of about $70,640 on April 7, 1978. Petitioners did not state that they had a cash hoard on either the application they submitted for their 1977 loan or their statement of joint financial condition. In 1978, petitioners reported $410 of interest income from Great Northwest Savings and Loans and North Pacific Bank, and $4,237 of interest expense on loans from First Interstate Bank of Washington (home mortgage), Great Northwest Savings and Loans, Rainier Bank, and North Pacific Bank. On April 7, 1978, petitioners owed several

thousand dollars on a motor home loan with a 17-percent interest rate.

From 1978 to 1982, petitioners (a) bought four properties for a total of $372,252, financing $255,700[2] of that amount; (b) spent $163,518 on insurance, mortgage payments, licensing fees, taxes, and other items, which they deducted on their tax returns; and (c) provided some support for family members, including Suil Peacock and his family, Song Lee, Kil Lee, K.C. Urbon, and Il Nam Lee. Petitioners reported that their adjusted gross income for that period was $264,799.

From 1978 to 1982, petitioners did not receive any gifts or inheritances that had significant value.

In early 1983, petitioners had outstanding loans from Northwest Federal, Puget Sound National Bank, and First Interstate Bank of Washington.

### 3. Petitioners' Cash Hoard

Many people saw petitioners with large amounts of cash from 1978 to 1982. None of them counted all of the cash. In 1978, Michael Koon, petitioner-wife's nephew-in-law, counted about $100,000 of petitioners' cash. A large amount of other cash was present that he did not count.

Petitioners buried some cash in a 5-gallon bucket under a cement walkway in their backyard in 1979, and dug it up in 1981.

---

[2] The parties agree that the amount financed was $246,994. However, the record shows that the amount financed was $255,700.

As discussed in par. B-3-e of the opinion, we find that petitioners had $279,000 in cash on hand and a net worth of $622,478 on December 31, 1982.

### 4.   The Glenstone and Valley Road Properties

Petitioner-husband obtained powers of attorney from Kiye Oglesby and Ki Chong Kim dated October 11, 1982, to deal with the property at 3600 Glenstone Avenue, Springfield, Missouri (the Glenstone property) on their behalf.  On April 1, 1983, petitioner-husband contracted with Ed O. Day to buy the Glenstone property for $325,000.  Petitioner-husband paid Ed O. Day $100,000 in cash as a downpayment on the property.

On May 25, 1983, petitioners agreed to buy property at 1541 Valley Water Mill Road (the Valley Road property), adjacent to the Glenstone property, for $80,000.  Of that amount, $70,000 was due on August 1, 1983.

On May 26, 1983, the Glenstone property transaction closed and petitioner-husband gave Ed O. Day $134,000 in cashier's checks and a $90,000 note.  Twelve of the 13 cashier's checks he gave Ed O. Day were in amounts less than $10,000.  Ki Chong Kim was listed as the buyer of two of the cashier's checks that petitioner-husband bought.

The record owners of the Glenstone property were petitioners, Kiye Oglesby, and Ki Chong Kim.  Neither Kiye Oglesby nor Ki Chong Kim knew that title to the Glenstone property was in their name.  On September 12, 1983, petitioner-

husband signed a quitclaim deed transferring Kiye Oglesby's and Ki Chong Kim's interests in the Glenstone property to himself.

In October 1983, petitioner-husband paid the $70,000 that was due on the Valley Road property with seven cashier's checks, six of which were in amounts less than $10,000.

5.   Petitioners' Other Use of Cash To Buy Property

In 1981, petitioners bought Suil Peacock a house in Colorado for $67,320 in cash.

In January 1983, petitioners paid $45,002 in cash to buy a motor home.  Petitioners made payments on the Glenstone and Valley Road properties with 20 cashier's checks totaling $204,000.  Of those checks, one was for $33,000, one was for $18,000, and 18 were for $9,000 or less.  Petitioner-husband bought all of the cashier's checks at different banks on the same day or the same bank on different days.

In the mid-1980's, petitioners bought property in Bremerton, Washington, by assuming a mortgage and paying $15,000 in cash on a second mortgage on the property.

6.    Summary of Petitioners' Use of Cash or Cashier's Checks
      in 1983

Petitioners used cash or cashier's checks to make the

following payments in 1983:

| Date | Amount | Description |
|------|--------|-------------|
| Jan. 28 | $45,002 | Purchase of Pace Arrow |
| Feb. 24 | 2,780 | Purchase of 1983 Bellew Trailer |
| Mar. 29 | 20,362 | Payments to IRS & property taxes |
| Apr. 1 | 100,000 | Downpayment for Glenstone property |
| May 25 | 10,000 | Downpayment for Valley Road property |
| May 26 | 134,000 | Second payment for Glenstone property |
| June 16 | 7,500 | Payment to IRS |
| Sept. 16 | 7,500 | Payment to IRS |
| Oct. 31 | 70,000 | Final payment for Valley Road property |
| Total | $397,144 | |

7.    1983 to 1987

Petitioners reported income from their saunas of $43,501,

$37,269, $95,595, $22,625, and $1,169 and deducted wages of

$60,300, $64,140, $82,623, $74,530, and $66,515, on the Schedules

C they filed with their tax returns for 1983 to 1987,

respectively.  Petitioners did not pay wages.

Petitioners did not receive gifts or inheritances of

substantial value from 1983 to 1987.

In January 1985, petitioner-wife reported to the Tacoma

police that $90,000 in cash had been stolen from their home.

Petitioners did not deduct a theft loss on their 1985 tax return.

Petitioners had bank accounts which paid $30,807 in interest

from 1983 to 1987 ($12,831 in 1983, $8,330 in 1984, $5,717 in

1985, $1,852 in 1986, and $2,077 in 1987).  Petitioners also had

IRA accounts during the years in issue.

F.   Skim Formula

K.C. Urbon picked up the daily sheets and cash from the saunas for 3 months in 1987.  Pursuant to petitioner-husband's instructions, K.C. Urbon reported 3/7 of petitioners' share of those receipts to petitioners' bookkeeper.

G.   Petitioners' Convictions for Income Tax Evasion

Both petitioners pleaded guilty to income tax evasion for 1987.

On January 18, 1990, during respondent's criminal investigation, District Counsel Attorney Milton J. Carter (Carter) informed petitioners and their attorney, Montie Day (Day), that respondent believed that petitioners understated their taxable income by a total of $336,729 for 1983, 1984, 1986, and 1987.  After a recess in which Day talked with petitioners, Day told Carter that petitioners buried about $353,000 under a concrete walkway behind their home in 1979, and dug up the money in 1981.  Day said that petitioners had (1) $228,000 from money petitioner-wife had in 1963 and an inheritance of $125,000 that petitioners were holding for Suil, and (2) about $125,000 from Tobey Peacock.

OPINION

A.   Net Worth Method

1.   Background

Respondent used the net worth method to determine petitioners' income for the years in issue.  Under the net worth

method, income is computed by determining a taxpayer's net worth (excess of the cost of assets over liabilities) at the beginning and end of a year. The difference between the two amounts is the increase in net worth. This difference is increased by adding nondeductible expenditures, including living expenses, and by subtracting gifts, inheritances, loans, and the like. Holland v. United States, 348 U.S. 121, 125 (1954). An increase in a taxpayer's net worth, plus his or her nondeductible expenditures, less nontaxable receipts, may be considered taxable income. Id.

In a net worth case, respondent must: (a) Establish the taxpayer's opening net worth with reasonable certainty, and (b) either show a likely income source or negate possible nontaxable sources. Holland v. United States, supra at 132-138; Brooks v. Commissioner, 82 T.C. 413, 431-432 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). Courts must closely scrutinize use of the net worth method. Holland v. United States, supra at 125. Its use requires the exercise of great care and restraint to prevent a taxpayer from being ensnared in a system which is difficult for the taxpayer to refute. Id.

   2.   Whether Respondent's Determinations of the Amount of
        Cash Petitioners Had on December 31, 1982, 1983, 1984,
        1985, 1986, and 1987 Are Arbitrary

Respondent determined that petitioners had $140,000 in cash on December 31, 1982, and $40,000 on December 31, 1983, 1984,

1985, 1986, and 1987.  Petitioners contend that respondent's determinations are arbitrary.  We disagree.

Day did not give respondent's agent a net worth statement as requested.  Respondent's agent gathered evidence to compute petitioners' net worth.  He reviewed financial statements that petitioner-husband gave to banks to obtain loans.  He learned that petitioners paid $45,002 in cash for a motor home in January 1983, made a $100,000 cash downpayment on the Glenstone property in April 1983, and made other large cash expenditures in 1983. Respondent's agent concluded that petitioners paid the first two large expenses from a cash hoard and the rest from their earnings in 1983.  He concluded that petitioners had $140,000 in cash on December 31, 1982, and that it came from the Tokyo Saunas.

Petitioners contend that respondent's determination about their income in 1983 is arbitrary because respondent determined that their income with only two saunas operating was larger than their income in later years with three saunas operating.  We disagree that this makes respondent's determination arbitrary. The only documentary evidence showing the number of employees petitioners had are the daily sheets that were not burned.  They show that petitioners had 10 employees who worked 35 days in 1983 and 8 employees who worked 28 days in 1987.  The number of employees at each sauna appears to have varied from one to five during the years in issue.  The record does not show how many employees worked at each sauna in each year in issue.  Thus, the

fact that the number of saunas changed may not have affected the total number of employees in any year and does not show that respondent's determination was arbitrary. However, as discussed at paragraph B-3-b below, we agree in part with petitioners that more of petitioners' 1983 expenditures were made with funds they had before 1983 than allowed by respondent.

Respondent also determined that petitioners had $40,000 in cash on hand on December 31, 1983, 1984, 1985, 1986, and 1987. The daily sheets for the 4 months that were admitted in evidence show that petitioners' average monthly gross receipts were about $40,000. Based on that, Hughes reasonably estimated that petitioners earned $40,000 in cash each month from their Tokyo Sauna businesses during the years in issue.

Petitioners point out that a senior agent who was teaching respondent's agent interview techniques testified that he suspected that petitioners made about $25,000 per month. However, he also said that this estimate was not based on the investigation in this case. His thoughts on this matter are made irrelevant by respondent's determination which was the result of an investigation in this case.

We conclude that respondent's determinations are not arbitrary.

3.   Whether Respondent Adequately Investigated Leads

Petitioners contend that respondent failed to investigate adequately leads they provided relating to their cash on hand on December 31, 1982.  We disagree.

Petitioners point out that respondent did not investigate whether petitioners' cement walkway had been relaid even though petitioners told respondent that they had buried cash in their backyard, built a cement walkway over it, and relaid the cement after they broke it to get the cash.  Petitioners argue that respondent should have checked to see if the cement had been relaid.  We disagree.  Respondent does not dispute that petitioners buried cash in a 5-gallon bucket under the walkway in 1979 and dug it up in 1981, but verifying that the walkway had been relaid would not show how much cash petitioners buried or had on hand on December 31, 1982.

Petitioners argue that respondent did not sufficiently interview witnesses who saw petitioners' cash.  We disagree.  Respondent's agent attempted to determine how much cash petitioners had.  No witness counted more cash in petitioners' possession than respondent determined petitioners had, and respondent would have learned nothing definite by interviewing witnesses who saw uncounted cash.  Petitioners did not offer any worthwhile leads which respondent failed to investigate.  We conclude that respondent did all that was required to check leads.

B.    Opening Net Worth and Cash on Hand

The parties agree about petitioners' opening net worth for the years in issue except for the amount of cash they had on hand on December 31, 1982, 1983, 1984, 1985, 1986, and 1987. Respondent contends that petitioners had a cash hoard of $140,000 on December 31, 1982.  Petitioners contend that they had more than $660,000 in cash on that date ($250,000 from Wilma MacFarland, $150,000 from Tobey Peacock, $200,000 from black market sales and skimming from slot machines in Vietnam, and more than $60,000 from previously taxed income).

We conclude that petitioners had much less than $660,000 in cash on hand on December 31, 1982, from the sources they claimed, but that they had more than respondent determined.  As discussed above at par. A-2, and below at par. B-3-e, we conclude that petitioners had $279,000 in cash on hand on December 31, 1982, and $40,000 on December 31, 1983, 1984, 1985, 1986, and 1987.

1.    Cash Hoard Sources Asserted by Petitioners

a.    Wilma MacFarland

Petitioners claim that they received $250,000 in cash from Wilma MacFarland.  Petitioners claim that the $250,000 includes a $125,000 loan that Wilma MacFarland made to petitioner-husband on July 30, 1979, with the understanding that the money would be repaid on demand without interest, but that any balance due when Wilma MacFarland died would be considered paid in full.  Wilma MacFarland died a few months after July 30, 1979.  Petitioner-

husband testified that he had not repaid any of the $125,000 when she died.

There is no credible evidence that Wilma MacFarland had a significant amount of money. She had few assets when she and MacFarland were divorced in 1973. MacFarland was required by court order to make support payments to her of $150 a month. She reported receiving less than $28,000 as wages or self-employment income on her income tax returns during her life, and never more than $3,600 in any year. She did not report any wages or self-employment income on her income tax returns for 1973 to 1979. We conclude that Wilma MacFarland was not the source of a significant amount of petitioners' cash hoard.

### b. Tobey Peacock

Petitioners claim that they received $150,000 in cash from Tobey Peacock as follows: (1) $70,000 in 1971, for Suil Peacock's education; (2) $50,000, which, right before Tobey Peacock died in 1973, he told petitioner-husband that he had hidden on his farm and that he wanted petitioner-husband to have; and (3) $30,000 at various times over the years. Petitioners point out that petitioner-husband was Tobey Peacock's only son.

There is no credible evidence in the record that Tobey Peacock had a significant amount of money. Tobey Peacock reported less than $3,000 as wages or self-employment income on his income tax returns during his life and never reported more than $1,200 in any year. We do not believe that he gave

petitioners money, especially considering that he disapproved of their lifestyle. We conclude that Tobey Peacock was not a source of a significant amount of petitioners' cash hoard.

c. Winston MacFarland

Petitioners claim that MacFarland gave them $75,000 in 1983 to buy an interest in the Glenstone property for his stepson, Ki Chong Kim, because he thought the gift would help save his marriage to Chang Un MacFarland. The documents relating to petitioners' purchase of the Glenstone property do not show that MacFarland was involved in the transaction. Ki Chong Kim's name was on a deed to the Glenstone property, but he never knew he had an interest in the property. Petitioners transferred Ki Chong Kim's interest in the Glenstone property to themselves a few months after they bought it. Petitioners claim they transferred the property to themselves because MacFarland told them to do so after Chang Un MacFarland and Ki Chong Kim moved to Korea and MacFarland lost hope of reconciliation. We disagree.

MacFarland had few assets when he and Wilma MacFarland were divorced in 1973. After 1973, MacFarland never reported on his income tax returns that he had earnings of more than $11,439 per year. After 1978, he did not report any wage or self-employment income on his income tax returns. MacFarland worked as an apartment manager for petitioner-husband from 1980 until the mid-1980's in exchange for free rent. MacFarland used his Social Security income to pay his expenses. He was careful not to spend

more than the amount of his Social Security checks. Petitioner-husband occasionally gave MacFarland small amounts of money. The two-bedroom house that MacFarland built and occupied was unfinished and had very little furniture. There is no credible evidence that MacFarland contributed $75,000 to buy the Glenstone property. The documents associated with petitioners' purchase of the Glenstone property do not show that MacFarland was involved. The person for whom MacFarland allegedly bought the property, Ki Chong Kim, did not know he had an interest in the property. We conclude that MacFarland did not contribute $75,000 to buy the Glenstone property.

d. Petitioner-Husband's Claimed $200,000 From Skimming and Black Market Sales in Vietnam

Petitioner-husband claims that he brought $200,000 in cash to the United States when he returned from Vietnam. He testified that he got the $200,000 in Vietnam during 1970 and 1971 by skimming money from U.S. Army slot machines and by selling beer and soda on the black market. Petitioner-husband testified that he did not tell anyone except petitioner-wife about his activities in Vietnam because he did not want people to know he had a lot of cash, and that they did not make this claim when he was being prosecuted for income tax evasion for 1987 because he knew that his actions had been illegal. Petitioners first made this claim during the trial of this case. We are not convinced by petitioners' belated claim that petitioner-husband brought a

significant amount of cash to the United States from Vietnam or that they still had it on December 31, 1982.

###### e. Petitioners' Claimed Cash Hoard From Previously Taxed Income

Petitioners' claim that they had more than $60,000 on December 31, 1982, that they had saved from previously taxed income was vague and unsubstantiated. We believe, however, that they had saved a substantial amount of cash from previously untaxed, skimmed income since they had been operating massage parlors since 1972.

###### f. Physical Evidence of Petitioners' Cash Hoard

Petitioners contend that they have shown that they had more than $660,000 of cash on hand at the beginning of 1983 because at least $500,000 could fit into a 5-gallon plastic bucket like the one they buried in their yard or a grocery bag like Michael Koon saw. We disagree. Respondent does not dispute that $500,000 could fit into a 5-gallon bucket or a grocery bag if the denomination of the bills were large. However, there is no evidence that more than $100,000 was ever counted.

Many people saw that petitioners had a large amount of cash. However, the only witness who said he counted any of petitioners' cash, Michael Koon, said that he counted $100,000 and that he believed he had counted about one-third of the cash that was present.

Petitioners contend that the fact that they used an ice chest to transport cash to Las Vegas establishes that they had a large amount of cash on hand.  Petitioners' proof is vague at best.  There is no credible evidence about the amount of cash in the ice chest.  Petitioners did not prove the denominations of the bills in the bucket, grocery bag, or ice chest.

Petitioners contend that the $287,000 difference between the listed liquid assets and the $590,000 subtotal for liquid assets on a loan application dated April 15, 1985, shows that they had a large cash hoard at that time.  We disagree.  The difference is a mistake, not evidence of a cash hoard.  Petitioners make a similar mistake under nonliquid assets where they report that $590,000 for liquid assets plus $80,000 for automobiles, and $100,000 for furniture and personal property equals total assets of $921,000.

g.   Conclusion Regarding Cash Hoard Sources Alleged by Petitioners

We conclude that petitioners vastly exaggerated the amount of cash they received from these sources.

2.   Respondent's Skim Formula

K.C. Urbon picked up the daily sheets and cash from the saunas for 3 months in 1987.  Pursuant to petitioner-husband's instructions, K.C. Urbon reported 3/7 of petitioners' share of the receipts to petitioners' bookkeeper.  Applying the 3/7

formula to the receipts shown on the four daily sheets in
evidence produces the following results:

|  | Joplin Nov. 1983 | Springfield Nov. 1983 | Springfield Apr. 1987 | Billings Apr. 1987 |
|---|---|---|---|---|
| Total receipts | $42,696 | $39,030 | $50,306 | $25,700 |
| Petitioners' share | 21,348 | 19,515 | 25,153 | 12,850 |
| Multiplied by 3/7 | 9,149 | 8,363 | 10,780 | 5,507 |
| Reported amounts | 8,944 | 8,124 | 10,779 | 5,189 |
| Difference | $205 | $239 | $1 | $318 |

Thus, petitioners told their bookkeeper about 3/7 of their one-half share of the gross receipts shown on these four daily sheets.

Petitioners contend that there is no proof that they used the skim formula in other months. We disagree. K.C. Urbon testified that petitioner-husband instructed her to use it and that she did for 3 months in 1987.

Respondent did not determine petitioners' sauna income by applying the 3/7 formula. However, the application of the skim formula to the 4 months for which daily sheets exist shows that respondent's determination is reasonable.

3. Petitioners' Tokyo Sauna Income

Petitioners argue that respondent's determination of the amount of petitioners' income from the Tokyo Saunas for 1983 is too large compared to the other years in issue because there is no evidence that the two Tokyo Saunas petitioners owned in 1983 had greater total earning capacity than the three they owned in 1984 and 1985. We agree with petitioners in part.

### a. Petitioners' 1983 Income From the Tokyo Saunas

The following chart shows the amount of petitioners' income from Tokyo Saunas as implied (1) from respondent's determination that petitioners had $140,000 cash on hand on December 31, 1982, and (2) from our conclusion that they had $279,000 cash on hand on that date:

### Income from Saunas

|  | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|
| Reported by petitioners | $43,501 | $37,269 | $95,595 | $22,625 | $1,169 |
| Unreported income from saunas if petitioners had $140,000 in cash on Dec. 31, 1982 | 221,961 | 45,598 | 8,608 | 69,788 | 29,872 |
| Total | $265,462 | $82,867 | $104,203 | $92,413 | $31,041 |
| Sauna income if petitioners had $279,000 in cash on Dec. 31, 1982 | $126,462 | $82,867 | $104,203 | $92,413 | $31,041 |

### b. Petitioners' Large Cash Purchases Early in 1983

Hughes concluded that petitioners had cash on hand on December 31, 1982, of $140,000 based on the fact that petitioners spent $45,002 in January 1983 and $100,000 in April 1983. He also concluded that the Tokyo Saunas did not produce that much income for petitioners in the first 4 months of 1983. We think that analysis is correct, except as discussed next. We believe

the Tokyo Saunas did not provide funds in 1983 for (1) the $45,002 expenditure on January 28, 1983; (2) the $100,000 expenditure on April 1, 1983; and (3) the $134,000 petitioners spent in May 1983 for the Glenstone property.  We believe that the May 1983 amount was paid before petitioners could have saved enough cash to have paid it from their 1983 earnings.  We believe that petitioners' saunas produced income to make their other $118,142 of cash purchases in 1983.  Where the Commissioner has determined a deficiency using the net worth method, we may adjust a determination of opening net worth shown by the trial record to be unrealistic.  Hoffman v. Commissioner, 298 F.2d 784, 786 (3d Cir. 1962), affg. in part on this issue T.C. Memo. 1960-160; Baumgardner v. Commissioner, 251 F.2d 311, 313-314 (9th Cir. 1957), affg. T.C. Memo. 1956-112; Potson v. Commissioner, 22 T.C. 912, 928-929 (1954), affd. sub nom. Bodoglau v. Commissioner, 230 F.2d 336 (7th Cir. 1956).  Thus, we conclude that petitioners had cash on hand of $279,000 on December 31, 1982.  We also conclude that petitioners saved most of the $279,000 from unreported income they received before 1983.  Based on our holding, Tokyo Saunas produced income for petitioners in 1983 of $126,462.

### c.   Petitioners' Use of Credit Cards

Petitioners contend that respondent did not properly account for credit card receipts in determining that petitioners had $40,000 in cash each year because petitioners had to pay the

masseuses their one-half of the credit card receipts in cash.  We disagree.  First, petitioners have not shown that the volume of credit card sales is significant.  Petitioners contend that the credit card receipts were up to 40 percent of their total receipts.  We disagree.  Petitioners only accepted credit card payments for about 1 year.  There is no convincing evidence of the total amount of petitioners' credit card receipts.  The unburned daily sheets show that the amount of credit card receipts was for less than 16 percent of total Billings receipts for 28 days in 1987, and there are no credit card receipts for the Springfield daily sheets for 1987.  Petitioners and respondent agree that petitioners had considerably less income in 1987 than the other years in issue.  Thus, we are not convinced that the credit card volume was significant.

Second, petitioners contend that each credit card sale reduced the amount of cash they received from the business because petitioners paid the masseuse her share in cash.  We disagree.  If a customer paid 2x dollars by credit card, and petitioners paid 1x dollars in cash to the masseuse, petitioners would receive all of the credit card payments.  The fact that petitioners did not split the credit card payment with the

masseuse offsets the fact that petitioners paid the masseuse her one-half in cash.[3]

### d. Masseuses' Average Earnings

Petitioners contend that respondent determined that petitioners received more income from the Tokyo Saunas than the total amount the masseuses earned, which petitioners contend shows that respondent's determination is in error since petitioners and the masseuses each got one-half of the payments. Petitioners based this contention on the assumption that there were 7 masseuses in 1983, 8 in 1984, 10 in 1985, 9 in 1986, and 6 in 1987, and based on what petitioners claim to be a high average of $36,000 per year per masseuse. We disagree. Petitioners' approach is accurate only if petitioners' assumption about the number of masseuses and their average income is accurate. No reliable records are available that show how many masseuses worked at the saunas. Petitioner-husband testified that they had six masseuses in 1983. On brief, petitioners estimate that they had seven masseuses in 1983. The unburned daily sheets show that they had 10 masseuses in November 1983. Petitioner-husband testified that one to five masseuses worked at each sauna at any given time.

---

[3] Petitioners do not contend that Tokyo Saunas paid a significant amount of credit card merchant fees.

Petitioners argue that petitioners did not have more income than the total amount reported as income on Federal income tax returns filed by the masseuses.[4] We disagree. The masseuses reported their income based on inaccurate Forms W-2 that they received from Tokyo Saunas. Thus, petitioners have not established that the masseuses' returns show how much income petitioners received.

### e. Opening Net Worth-Conclusion

The parties agree that petitioners' opening net worth was $343,478 before considering the amount of their cash on hand. We have found that petitioners had $279,000 in cash on December 31, 1982. Therefore, we conclude that petitioners had an opening net worth of $622,478 on December 31, 1982.

### 4. Petitioners' 1985 Theft Claim

Petitioners claim that $90,000 in cash was stolen from them in January 1985, and that respondent's $40,000 opening cash on hand figure on January 1, 1985, is understated by that amount. In January 1985, petitioner-wife reported to the Tacoma police that $90,000 in cash had been stolen from her home. Petitioner-wife told the police that it had been her mother's money.

---

[4] Before trial, in response to an order of the Court, respondent gave petitioners the amount of income each masseuse had reported without showing the masseuses' names.

We do not believe that the $90,000 was stolen from petitioners.  The record gives us several grounds on which to doubt petitioner-wife's credibility.  Petitioners concede that Il Nam Lee never gave them any money.  Petitioners contend that petitioner-wife was referring to petitioner-husband's mother, not her own mother.  We find that to be an implausible attempt to evade the effect of her prior reference to her mother.  Petitioner-wife admits to giving false information to U.S. immigration officials to help Suil Peacock and K.C. Urbon immigrate to the United States.  She testified that she never saw any of the financial records from the saunas, but she received the sheets and the money when petitioner-husband was in jail in 1987.  We are not convinced that $90,000 was stolen from petitioners in January 1985.

5.   Petitioners' 1985 Personal Expenditures

Respondent concedes that petitioners gave Suil Peacock $48,940 in 1985, instead of $74,000 (a reduction of $25,060) as respondent determined in the notice of deficiency.[5]  Petitioners contend that respondent's $25,060 concession results in an overpayment for 1985.  We disagree.  Respondent did not include petitioners' living expenses in respondent's net worth calculation and contends that this offsets respondent's

---

[5] Petitioners' net worth is increased by the amount of the funds they transferred to Suil Peacock.

concession.[6]  Petitioners argue that respondent already included

living expenses in respondent's determination.  We disagree.

Respondent did not include petitioners' living expenses in the

original net worth calculation.  We conclude that those expenses

offset respondent's $25,060 concession and that respondent did

not overstate petitioners' 1985 personal expenditures.

6.    Petitioners' Unreported Taxable Income

Respondent determined that petitioners had unreported income

of $221,961 in 1983, $45,598 in 1984, $8,608 in 1985, $69,788 in

1986, and 29,872 in 1987.  Based on respondent's concessions and

the foregoing, we conclude that petitioners had unreported

taxable income of $82,961 in 1983, $45,598 in 1984, $8,608 in

1985, $60,788 in 1986, and $29,822 in 1987.

---

[6] Respondent does not contend that petitioners are liable
for larger deficiencies than respondent determined in the notice
of deficiency for any of the years in issue due to the omission
of petitioners' personal living expenses from respondent's net
worth calculation.  Respondent bears the burden of proof under
Rule 142(a) if respondent raises new matter which either alters
the original deficiency or requires the taxpayers to present
different evidence.  Seagate Tech. Inc. v. Commissioner, 102 T.C.
149, 169 (1994); Vetco, Inc. v. Commissioner, 95 T.C. 579, 588
(1990); Achiro v. Commissioner, 77 T.C. 881, 890 (1981).  We
conclude, and petitioners do not contend otherwise, that this is
not new matter under Rule 142(a) for which respondent bears the
burden of proof because raising those expenses as offsets does
not require petitioners to offer any different evidence and does
not increase the original deficiency.

C.   <u>Additions to Tax for Fraud Under Section 6653(b)</u>

   1.   <u>Background</u>

Respondent determined that petitioners are liable for additions to tax for fraud for 1983, 1984, 1985, 1986, and 1987. For 1983, 1984, and 1985, if any part of a tax underpayment is due to fraud, the addition to tax under section 6653(b)(1) is 50 percent of the underpayment, and the addition to tax under section 6653(b)(2) is 50 percent of the interest payable under section 6601 for that part of the underpayment that is due to fraud.  For 1986 and 1987, the addition to tax for fraud under section 6653(b)(1)(A) is 75 percent of the part of the underpayment that is due to fraud, and the addition to tax under section 6653(b)(1)(B) is 50 percent of the interest payable under section 6601 for that part of the underpayment that is due to fraud.  Under section 6653(b)(1)(A) and (B), if respondent establishes that part of the underpayment is due to fraud, the additions to tax apply to the entire underpayment except with respect to any part that petitioners show is not due to fraud. Sec. 6653(b)(2).

Respondent has the burden of proving fraud by clear and convincing evidence.  Sec. 7454(a); Rule 142(b).  For purposes of

section 6653(b), fraud means actual, intentional wrongdoing, Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), or intentionally committing an act specifically to evade a tax believed to be owing, Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Respondent must prove the existence of an underpayment. Parks v. Commissioner, 94 T.C. 654, 660 (1990). Respondent may not rely on petitioners' failure to carry their burden of proof as to the underlying deficiency. Parks v. Commissioner, supra at 660-661; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989). Respondent must also prove that petitioners intended to evade taxes by conduct intended to conceal, mislead, or otherwise prevent tax collection. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, supra at 661; Castillo v. Commissioner, 84 T.C. 405, 408-409 (1985); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Respondent must prove that each spouse is liable for the additions to tax for fraud. Sec. 6653(b)(4) (for 1983, 1984, and 1985); sec. 6653(b)(3) (for 1986 and 1987). Thus, respondent must prove that each spouse committed fraud. Hicks Co. v. Commissioner, 56 T.C. 982, 1030

(1971), affd. 470 F.2d 87 (1st Cir. 1972); <u>Stone v. Commissioner</u>, 56 T.C. 213, 227-228 (1971).

## 2.   Underpayment of Tax for the Years in Issue

Petitioners argue that respondent has not proven by clear and convincing evidence that petitioners underpaid tax.

Respondent may prove that an underpayment exists by proving that the taxpayer had a likely source of unreported income, <u>Holland v. United States</u>, 348 U.S. at 137-138; or, if a taxpayer alleges that he or she had a nontaxable income source, by disproving the alleged nontaxable source, <u>United States v. Massei</u>, 355 U.S. 595 (1958).

Petitioners underreported their income by $82,961 in 1983, $45,598 in 1984, $8,608 in 1985, $60,788 in 1986, and $29,822 in 1987.  Petitioner-husband testified that petitioners earned about $20,000 per month from their saunas.  Petitioners reported significantly less than that amount each year in issue.  We conclude that respondent has proven by clear and convincing evidence that petitioners unreported their income for each of the years in issue.

## 3.   Fraudulent Intent

Fraudulent intent may be proven by circumstantial evidence. <u>Edelson v. Commissioner</u>, 829 F.2d 828, 832 (9th Cir. 1987), affg. T.C. Memo. 1986-223; <u>Rowlee v. Commissioner</u>, <u>supra</u>; <u>Stephenson v. Commissioner</u>, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th

Cir. 1984). The courts have developed a number of objective indicators or "badges" of fraud. Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Several badges of fraud are present in this case: (a) Substantially underreporting income for several years; (b) receiving income from illegal sources; (c) maintaining inadequate records; (d) destroying records; (e) providing incomplete or false information to the tax return preparer; (f) filing false payroll tax returns; (g) giving implausible or inconsistent explanations of behavior; and (h) using cash and cashier's checks extensively. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Ruark v. Commissioner, 449 F.2d 311, 312-313 (9th Cir. 1971), affg. T.C. Memo. 1969-48.

### a. Pattern of Large Understatements of Income

Consistently underreporting income for several years, especially with discrepancies of 100 percent or more between net income and net income reported on tax returns, is a badge of fraud. Holland v. United States, supra at 137-139; Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37 and T.C. Memo. 1970-144. Petitioners reported income of $38,334 in 1983, $37,161 in 1984, $94,187 in 1985, $32,873 in 1986, and $6,720 in 1987. They underreported their income by $82,961 in 1983, $45,598 in 1984, $8,608 in 1985, $60,788 in 1986, and $29,822 in 1987. They both knew that they

were substantially underreporting their income.  This badge of fraud applies to both petitioners for each year in issue.

b.    Income From Illegal Sources

A taxpayer's receipt of illegal income is a badge of fraud. Bradford v. Commissioner, supra at 308; United States v. Hamilton, 620 F.2d 712, 716-717 (9th Cir. 1980).  Both petitioners knew that their income in the years in issue was from an illegal source.

c.    Inadequate Records, Destroying Records, and Reporting False Information to their Tax Return Preparer

Failing to maintain accurate records is a badge of fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; Reaves v. Commissioner, 295 F.2d 336, 338 (5th Cir. 1961), affg. 31 T.C. 690 (1958); see Alexander Shokai, Inc. v. Commissioner, T.C. Memo. 1992-41, affd. 34 F.3d 1480 (9th Cir. 1994).  Destroying records and providing incorrect information to a tax return preparer are also badges of fraud. Spies v. United States, 317 U.S. 492, 499 (1943) (destroying records); Estate of Temple v. Commissioner, 67 T.C. 143, 162-163 (1976) (giving incorrect information to tax return preparer). Petitioner-wife told Kil Lee to burn the daily sheets he was storing.  Petitioner-husband destroyed daily records of receipts and gave false weekly summaries of their receipts and false information about their expenses to their tax return preparer.

This badge of fraud applies to both petitioners for each year in issue.

d.    Filing False Payroll Tax Returns

Filing false payroll tax returns is an indication of fraud. See Estate of Santuccio v. Commissioner, a Memorandum Opinion of this Court dated April 11, 1952.  Petitioner-husband directed that pre-signed payroll papers be prepared and provided to petitioners' income tax return preparer showing that masseuses were paid about $200 a week.  Petitioner-husband withheld taxes from the masseuses at a fixed amount regardless of how much money the masseuses earned and issued Forms W-2 which he knew showed substantially less income than the masseuses earned.  This badge of fraud applies to petitioner-husband for each year in issue.

e.    Implausible or Inconsistent Explanations

Implausible or inconsistent explanations of behavior by a taxpayer can show fraudulent intent.  Bradford v. Commissioner, supra at 307.  Many of petitioners' explanations of their behavior are implausible or inconsistent.  Petitioner-husband testified that the Joplin Tokyo Sauna closed due to zoning changes; however, it closed because prostitution was occurring on its premises.  Petitioner-husband stated that he did not keep money in banks, yet petitioners maintained bank accounts which paid $30,800 in interest from 1983 to 1987 and IRA accounts during the years in issue.  Petitioner-wife denied that she

reviewed any daily sheets, yet K.C. Urbon gave the sauna expense records to petitioner-wife. Petitioners contend that petitioner-wife was too sick to run the business and that she did not visit the saunas after 1982. However, the masseuses testified that petitioner-wife visited the saunas after 1982. Petitioners' claim that $400,000 of their cash on hand on December 31, 1982, came from Wilma MacFarland, Tobey Peacock, and MacFarland is implausible.

Petitioner-wife admitted that she lied to U.S. immigration officials so her relatives could enter the United States. Petitioner-husband testified that he made money in Vietnam on the black market and by skimming cash from slot machines. Petitioner-husband testified that when his father died, he removed $50,000 from his stepmother's property without telling her. Both petitioners instructed the masseuses not to tell others of the correct amount of income they earned. Petitioners' testimony frequently was implausible, inconsistent, or showed that they had a propensity for unscrupulous behavior.

This badge of fraud applies to both petitioners for each year in issue.

f.   Dealings in Cash and Cashier's Checks

Petitioners dealt extensively in cash to avoid scrutiny of their finances, a factor which can suggest fraud. Bradford v. Commissioner, 796 F.2d at 308. Petitioner-husband used cashier's

checks under $10,000 to avoid reporting requirements. See sec. 6050I. Petitioner-wife received cash from the masseuses in petitioner-husband's absence. Petitioners bought properties with cashier's checks in both petitioners' names. This badge of fraud applies to both petitioners for each year in issue.

### g.    Petitioners' Other Contentions

Petitioners contend that petitioner-wife was too sick and distraught by her mother's death to have intended to evade taxes or be liable for fraud in the years in issue. We disagree. Petitioner-wife clearly participated in supervising the saunas and in the scheme to skim cash from them in the years in issue.

### h.    Conclusion

Respondent has shown by clear and convincing evidence that both petitioners fraudulently intended to underpay tax for each of the years in issue.

### 4.    Items Attributable to Fraud

Respondent has shown by clear and convincing evidence that petitioners' entire underpayment of tax for each year in issue was intentional and due to fraud. Thus, petitioners are liable for the additions to tax under section 6653(b)(1) and (2) for 1983, 1984, and 1985 and under sections 6653(b)(1)(A) and (B) for 1986 and 1987 with respect to the entire underpayment of tax for each year.

5.   Whether Petitioners Are Collaterally Estopped From Denying Fraud for 1987

Petitioners contend that they are not collaterally estopped from denying fraud for 1987 because the government violated their rights under Brady v. Maryland, 373 U.S. 83 (1963) by failing to disclose exculpatory evidence during their criminal prosecution.

Federal and State prosecutors must disclose all evidence that exculpates defendants in a criminal prosecution. Id. Both petitioners pleaded guilty to tax evasion for 1987. Taxpayers who have been convicted of income tax evasion for a tax year generally are collaterally estopped from denying fraud for that year. Gray v. Commissioner, 708 F.2d 243, 246 (6th Cir. 1983), affg. T.C. Memo. 1981-1. Petitioners contend that memoranda of interviews of witnesses, such as Kil Lee and Kiye Oglesby, are exculpatory. Petitioners contend that they did not consider whether there were Brady violations in their decision to plead guilty because they first learned about Brady violations at the trial in this case.

Petitioners contend that they are not collaterally estopped from denying that they are liable for additions to tax for fraud for 1987. We disagree. First, the memoranda of interviews are not in the record. Second, the memoranda of interviews are not exculpatory. Third, it generally is not appropriate to collaterally attack a criminal proceeding in a later civil

proceeding.  See Armstrong v. United States, 173 Ct. Cl. 944, 354 F.2d 274, 291 (1965); Ochs v. Commissioner, T.C. Memo. 1986-595. We conclude that petitioners are collaterally estopped from denying that they are liable for the addition to tax for fraud for 1987.

### 6.  Conclusion

We conclude that respondent proved by clear and convincing evidence that both petitioners are liable for additions to tax for fraud for each of the years in issue.

## D.  Statute of Limitations

Petitioners allege that the statute of limitations bars assessment and collection of tax for the years at issue. Respondent argues that the 3-year limit on the time to assess tax under section 6501(a) does not apply here because petitioners' underpayments were due to fraud.  We have found that petitioners committed fraud; thus, there is no limit on the time respondent may assess tax.  Sec. 6501(c)(1); Vannaman v. Commissioner, 54 T.C. 1011, 1018 (1970).  We hold that the statute of limitations does not bar respondent from assessing and collecting tax for the years in issue.

## E.  Substantial Underpayment of Tax Under Section 6661

Respondent determined that petitioners are liable for the addition to tax for substantial understatement of income tax under section 6661.  If assessed after October 21, 1986, the

addition to tax is 25 percent of any underpayment attributable to the understatement.  Sec. 6661(a); <u>Pallottini v. Commissioner</u>, 90 T.C. 498, 503 (1988).  A substantial understatement is one which exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6661(b)(1).  The Commissioner may waive this addition to tax if the taxpayer had reasonable cause for the understatement and acted in good faith.  Sec. 6661(c).

Petitioners contend that they did not substantially understate their income for 1983, 1984, 1985, 1986, or 1987. Petitioners raise no other defense.  We hold that petitioners are liable for the addition to tax under section 6661 if the Rule 155 computation shows that there is a substantial understatement.

F.    <u>Self-Employment Tax Under Section 1401</u>

Section 1401 imposes a tax on net earnings from self-employment, defined as gross income derived from carrying on a trade or business, less allowable deductions.  Sec. 1402(a); sec. 1.1401-1(c), Income Tax Regs.  Petitioners did not argue this issue at trial or on brief.  We find that petitioners are liable for self-employment tax for the years in issue.

To reflect the foregoing,

<u>Decision will be</u>

<u>entered under Rule 155.</u>